## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                            :
**SECURITIES AND EXCHANGE COMMISSION,**    :
                                            :
  **Plaintiff,**                           : **CIVIL ACTION**
                                            : **NO.**
   **v.**                                  :
                                            : **07-11151**
                                            :
**STEVEN FORMAN,**                         : **TRIAL BY JURY**
**ARTHUR HABERMAN,**                       : **DEMANDED**
**RICHARD J. WESTELMAN,**                  :
                                            :
  **Defendants.**                          :
_____:

### COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

### SUMMARY

1.        From at least 2001 through at least 2003 (the "relevant period"), senior officers of Speechworks International, Inc. ("Speechworks" or the "company"), formerly a Delaware corporation with its principal place of business in Boston and whose stock was publicly traded in the United States, engaged in a fraudulent scheme to inflate revenues and other important financial metrics so as to mislead the company's actual and potential investors.  The scheme was orchestrated by Speechworks' former chief financial officer ("CFO"), Richard J. Westelman ("Westelman"), with the active support and collaboration of Speechworks' former corporate controller, Steven Forman ("Forman").  Speechworks' former director of finance, Arthur Haberman ("Haberman"), also violated and aided and abetted Speechworks' violations of various books and records provisions of the federal securities laws .  As a result of the scheme, Speechworks' quarterly revenues for the first, second, third and fourth quarters of 2001 were

materially overstated by 9%, 11%, 5%, and 5% respectively, and year end revenues for 2001 were overstated by 7%.

2.      The improperly recognized sales transactions all involved an original equipment manufacturer ("OEM"), Intervoice, Inc. ("Intervoice"), which licensed and resold Speechworks' software to third parties on a royalty basis.  In each instance, pursuant to oral side agreements between Westelman and Intervoice's CFO, Rob Roy J. Graham ("Graham"), Speechworks recognized revenues on royalty payments made by Intervoice prior to its shipment of software to third parties. Westelman and Forman knew, however, that Speechworks' publicly disclosed revenue recognition policy called for revenue from royalties paid by OEMs like Intervoice to be recognized upon the sale of software by the OEM to a third party.  Westelman and Forman also knew that GAAP and Speechworks' revenue recognition rules required that a deal's terms and conditions be memorialized in a signed writing, which was not the case for the Intervoice royalty prepayments.

3.      In the first quarter of 2001, Westelman had Speechworks improperly record and report as revenue a purported $900,000 royalty payment made by Intervoice.  This payment was not based on sales to third parties, but rather was made by Intervoice in return for Westelman agreeing on behalf of Speechworks to favorably amend the terms of a warrant that Intervoice held to purchase Speechworks stock.  The $900,000 should not have been counted as revenue, but rather should have been treated as additional paid-in capital.

4.      In May 2001, Intervoice agreed to prepay to Speechworks up to $2,000,000 in royalties over the second, third and fourth quarters of 2001 prior to Intervoice's sale of Speechworks' software to third parties.  Intervoice agreed to prepay for the royalties in return for Speechworks' agreement to buy $1 million of hardware from Intervoice before it actually needed

the equipment.  In connection with this transaction, Westelman and Forman engaged in a scheme to have Speechworks improperly recognize and report the prepaid royalties as software license revenues in the amounts of $1 million during the second quarter of 2001, $500,000 during the third quarter of 2001, and $500,000 during the fourth quarter of 2001.  Westelman and Forman knew or recklessly disregarded the fact that this revenue was improperly recognized and reported because, *inter alia*, it was done in advance of the sale of software to third parties by Intervoice, and the transaction's essential terms and conditions were not memorialized in a writing signed by Intervoice.

5.      In addition to the maintenance of false internal books and records, the circumvention of internal controls, and the preparation of misleading financial disclosures to investors, Westelman's and Forman's scheme also involved knowingly and/or recklessly concealing Intervoice's prepaid royalty payments from the company's outside auditors.  During the relevant period, Westelman and Forman signed materially misleading management representation letters to outside auditors that knowingly or recklessly contained false information, including the fact that the company's financials had been prepared in accordance with GAAP and that they were aware of no oral side agreements.  Westelman and Forman knew or recklessly disregarded the fact that Speechworks was providing falsified reports from Intervoice to the outside auditors which hid the prepaid royalties as specific product sales to third parties in Texas.  Finally, despite the unique and otherwise material nature of the prepaid royalties, Westelman and Forman failed to follow the normal and expected practice at the company for dealing with unusual transactions and had no contemporaneous discussions with Speechworks' outside auditors related to the nature or accounting treatment of the transaction.

6.     For all of the transactions at issue, Speechworks recognized revenue in a manner that departed from GAAP and its own publicly disclosed revenue recognition policies.

7.     By engaging in the transactions and practices alleged in this Complaint:

a.     Forman violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [15 U.S.C. §§ 78j(b) and 78m(b)(5) and 17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and aided and abetted Speechworks' violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5,12b-20, 13a-1 and 13a-13 thereunder [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13];

b.     Westelman violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [15 U.S.C. §§ 78j(b) and 78m(b)(5) and 17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; aided and abetted Speechworks' violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13]; and aided and abetted Intervoice's violations of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5].

c.     Haberman violated Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1]; and aided and abetted violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5,12b-20, 13a-1 and 13a-13 thereunder [15 U.S.C. §§78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

8.      Accordingly, the Commission seeks entry of a permanent injunction against each defendant prohibiting further violations of the federal securities laws and seeks civil monetary penalties.  With respect to defendants Westelman and Forman, the Commission also seeks a bar prohibiting each from serving as an officer or director of a public company.

## JURSISDICTION

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C.  §§ 78u and 78aa].

10.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and (e) of the Securities Act [15 U.S.C. § 77t(b) and (e)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

11.      In connection with the conduct alleged herein, the defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce.  Additionally, much if not all of the material misconduct described herein took place in Massachusetts, where Speechworks was headquartered and Westelman, Forman and Haberman lived and worked.

## DEFENDANTS

12.      Steven Forman, 48, of Chelmsford, Massachusetts, joined Speechworks as its corporate controller in August 1999, a position he held until August 2003.  Forman is a former certified public accountant.  His license has been inactive since 1992.  Forman was the only member of Speechworks' senior finance staff to have been a certified public accountant.  Forman

reported directly to Westelman.  As an officer of Speechworks, Forman owed a fiduciary duty to the company's shareholders.

13.     Richard J. Westelman, 48, of Scituate, Massachusetts, joined Speechworks in August 1998 as its CFO, a position he held until August 2003.  As an officer of Speechworks, Westelman owed a fiduciary duty to the company's shareholders.

14.     Arthur Haberman, 44, of Sudbury, Massachusetts, joined Speechworks in 1996 as its director of finance, a position he held until August 2003.  Haberman reported to Westelman once he joined Speechworks in 1998 and then switched to reporting to Forman after Forman joined Speechworks in 1999.

## RELATED PARTIES

15.     Speechworks, formerly a Delaware corporation with its principal place of business in Boston, Massachusetts, was acquired by ScanSoft, Inc. ("ScanSoft") in August 2003. Prior to its acquisition, Speechworks' stock was traded on the NASDAQ National Market System and was registered with the Commission pursuant to Section 12(g) of the Exchange Act. In September 2005, ScanSoft merged with Nuance, Inc., and the combined entity was renamed Nuance.  Speechworks' fiscal year followed a calendar year schedule, with the first quarter ending on March 31, the second quarter ending on June 30, the third quarter ending on September 30, and the fourth quarter ending on December 31.

16.     Intervoice, formerly known as Intervoice-Brite, Inc., is a Texas corporation with its principal place of business in Dallas, manufactures interactive voice recognition and telecommunications systems.  At all times discussed in this memorandum, Intervoice's stock was traded on the NASDAQ National Market System and was registered with the Commission pursuant to Section 12(g) of the Exchange Act.  Intervoice's fiscal year did not follow a calendar

year schedule -- its first fiscal quarter ended on May 31, its second fiscal quarter ended on

August 31, its third fiscal quarter ended on November 30, and its fourth fiscal quarter ended on

February 28 or 29.

## THE SCHEME

### I.    The Speechworks/Intervoice Relationship

17.    During the relevant period, Speechworks manufactured a variety of speech

recognition and related software products, provided professional services, and occasionally

resold computer hardware manufactured by others.  Speechworks sold its software products

directly to end-users though a sales force and indirectly through OEM's, including Intervoice.

18.    During the relevant period, Intervoice manufactured computer hardware systems,

including interactive voice recognition systems that combined components and integrated

software.  Intervoice sold its products directly to end users and through distributors.  Intervoice

integrated Speechworks' voice recognition software into its hardware systems, and sub-licensed

the software to its customers as part of the systems' sale.

19.    Speechworks' software sales to Intervoice were controlled by an Original

Equipment Manufacturer Agreement (the "OEM Agreement").  The OEM Agreement gave

Intervoice the right to sublicense certain Speechworks software products.  Under the OEM

Agreement, Speechworks provided Intervoice with a master copy of specifically identified

software, which Intervoice installed on its own products, and sold to third parties.  Once the

product was sold, Intervoice incurred the obligation to pay Speechworks a specific royalty based

on the type of software product sold.  The OEM Agreement stated that if Speechworks were to

develop software with new functionality, Intervoice and Speechworks would have to work out

mutually agreeable terms to cover the resale of the new product.

20.     Under the terms of the OEM Agreement during the relevant period, Intervoice was required to provide a statement to Speechworks setting forth the amount of the products(s) sold by Intervoice to third parties and the resulting royalties (the "Royalty Report"). The OEM Agreement was modified in 2000 such that the Royalty Report included, for third party end users in the United States, the state into which the products were shipped, and for foreign customers, the country into which the products were shipped. The cover letter of the Royalty Report confirmed the amounts and types of products that Intervoice had shipped during the reporting period and the total royalties owed. Intervoice sent Speechworks the Royalty Report approximately one month after the close of its fiscal quarter. During the relevant period, the Royalty Reports were addressed and sent to Haberman and distributed to Westelman, Forman, and others.

## II.    Speechworks Revenue Recognition Policy

21.     Forman and Westelman, working with the company's outside auditors, drafted the company's revenue recognition policy, which was originally published in Speechworks' Form S-1 registration statement filed with the Commission in July 2000. Speechworks' 2000 Forms 10-K reiterated the policy and provided that Speechworks recognized revenue in accordance with, *inter alia*, AICPA Statement of Position 97-2 ("SOP 97-2") and the SEC's Staff Accounting Bulletin No. 101 ("SAB 101"). The pertinent portion of Speechworks' publicly disclosed revenue recognition policy, as stated in Speechworks' 2000 Form 10-K (filed on or about March 16, 2001), provided that:

> We recognize revenue from the licensing of software . . ., provided that no significant obligations remain, evidence of the arrangement exists, the fees are fixed or determinable and collectibility is reasonably probable. . . . When OEM's license our software, we receive a royalty. We recognize the revenue from these royalties upon delivery to the third party when such information is available, or when the OEM notifies us of the sale.

8

22.     This revenue recognition policy was not changed in any of Speechworks' Forms 10-Q for 2001, and was repeated in Speechworks' 2001 Form 10-K, filed on or about March 21, 2002.

III.    **Speechworks' SEC Filings, Quarterly**
       **Financial Results Releases and Analyst Calls**

23.     During the relevant period, Forman, who was responsible for Speechworks' day-to-day finance functions, prepared the initial drafts of the company's periodic Commission filings (e.g., Forms 10-Q and 10-K), including the management discussion and analysis ("MD&A") section, the section concerning the company's revenue recognition policies, and the financial statements and metrics included therein.   Forman read the filings line by line for content prior to submission, confirmed that the numbers in the filings matched those in the company's books and records, and collected and incorporated others comments into the filings. Once Forman ensured that Westelman and others had signed the final version of a periodic Commission filing, he filed the document with the Commission using the services of a third party vendor, thereby distributing the filing to the public.

24.     Westelman, working closely with Forman, reviewed and edited Speechworks' periodic Commission filings (e.g., Forms 10-Q and 10-K), which he also signed prior to their being filed with the Commission.

25.     During the relevant period, Forman prepared the initial drafts of the financial information that Speechworks included in its quarterly earnings press releases that announced the company's quarterly financial results.  Forman also provided the financial numbers used for the scripted portion of quarterly earnings calls in which financial results and other matters were orally disclosed to investors and analysts.  During the relevant period, Forman also reviewed the

quarterly earnings press releases and quarterly earnings call scripts for content, confirmed that the numbers in the public statements matched those in the company's books and records, and collected and incorporated others comments into the statements.

26.     During the relevant period, Westelman, once again working closely with Forman, reviewed and approved Speechworks' quarterly earnings press releases and the quarterly earnings call scripts.  Westelman read the financial results portion of the quarterly earnings call scripts to investors and analysts during quarterly earnings calls and then helped answer questions during the calls.

**IV.     The First Intervoice Transaction: Aiding and Abetting
Intervoice's Improper Recognition of Revenue**

27.     During Intervoice's third quarter of fiscal year 2001, Westelman aided and abetted Intervoice's fraudulent recognition of $1.4 million of revenue by facilitating the improper removal of a reserve associated with hardware systems sold to Speechworks during the prior fiscal year.

28.     In February 2000, Intervoice sold Speechworks approximately $1.0 million of hardware, and then shipped the goods to a third party warehouse to await installation by Intervoice once Speechworks found customers for the products (i.e. Speechworks bought products prior to having final orders from its customers).  Pursuant to an oral agreement between Westelman and Graham, Intervoice agreed to adjust the systems' configurations or substitute new systems to meet the needs of Speechworks' customers.  Intervoice improperly recorded the $1.0 million sale as revenue in its fourth quarter of fiscal 2000.  Haberman maintained control of this inventory for Speechworks and coordinated any reconfigurations or substitutions needed to meet Speechworks' actual end customer's requirements.

29.     Intervoice implemented new accounting procedures pursuant to SAB 101 in the first fiscal quarter of 2001.  As part of the SAB 101 implementation, Intervoice established a sales reserve on its books of approximately $1.4 million associated with the hardware sales to Speechworks for resale (most of which related to the fourth quarter sale), wherein Intervoice retained a post-shipment installation obligation.  The reserve had the effect of reducing Intervoice's revenue in the first quarter of fiscal 2001, and deferring the revenue associated with the $1.4 million in hardware sales until such time as the installation obligation was satisfied.

30.     In or about October 2000, Graham and Westelman schemed to have Speechworks provide falsified documents that purported to remove the installation obligations associated with the $1.4 million in hardware sales so that Intervoice could remove the reserve and recognize the revenue from the deals.  On November 6, 2000, on Graham's instructions, Intervoice faxed documents to Speechworks that Graham knew, or was reckless in not knowing, falsely stated that Speechworks had completed the installation obligations associated with the hardware systems. At Graham's request, Westelman instructed Haberman to sign the releases provided by Intervoice.  The documents had a false acknowledgement that Speechworks had installed the products and purportedly released Intervoice from its installation obligation.  After signing the false releases, Haberman discussed with Forman his concern that that Intervoice may be trying to improperly recognize revenue.

31.     Graham and Westelman knew the releases were false and misleading because they both knew that the products were still sitting in a third party warehouse and that if necessary, Intervoice would still install the products.  Because of Graham's and Westelman's conduct, Intervoice improperly removed the reserve and improperly recognized approximately $1.4 million in revenue.

32.    The improper recognition of the revenue from these sales resulted in Intervoice filing a false and misleading Form 10-Q for the third fiscal quarter of 2000, filed with the Commission on January 12, 2001, which materially overstated Intervoice's net income by 242%.

**V.    The Second Intervoice Transaction: Improperly Recognizing a $900,000 Payment as Revenue**

33.    During Speechworks' first fiscal quarter of 2001, as a result of Westelman's conduct, Speechworks improperly recognized as revenue a $900,000 cash payment from Intervoice.  This transaction arose when, on or about February 2001, Graham asked Westelman whether Speechworks would amend a Warrant to purchase 741,237 unregistered shares of Speechworks common stock (the "Warrant"), which Intervoice had previously obtained from Speechworks in January 1997.  Specifically, Graham requested that Speechworks amend the Warrant to add a "cashless exercise" provision which, Graham claimed, would allow Intervoice to immediately sell the unregistered shares under a registration exemption.  Westelman, however, demanded that Intervoice provide Speechworks with additional incremental royalty revenue in return for amending the Warrant.  Graham agreed to the terms and, on February 6, 2001, Intervoice exercised the Warrant pursuant to the cashless exercise provision, receiving 690,052 shares of stock.

34.    On or about March 28, 2001, Graham prepared and sent to Haberman the customary quarterly Royalty Report which showed that Intervoice owed Speechworks a total of $1,575,000 in royalties, including $899,042.50 which was identified as a "prepayment."  In fact, this purported prepayment was the incremental revenue that Graham had agreed to provide to Speechworks in return for Speechworks amending the Warrant.

35.    That same day, Westelman sent an email to Graham stating that when they had previously discussed the consideration Intervoice would provide in return for amending the

Warrant, their understanding was that the payment would be additional incremental revenue, and not a prepaid credit balance. Westelman also expressed concern that Speechworks could not recognize revenue on a royalty characterized as a "prepayment" because the company's revenue recognition policy called for Speechworks to recognize revenue upon confirmation that Intervoice had sold and shipped software to third parties. He then asked Graham to characterize the payment within the Royalty Report as royalties for products that had shipped to end customers in Texas.

36.      Graham sent a reply email indicating that he would do as asked. He then caused a new Royalty Report and accompanying cover letter to be sent to Speechworks. The new Royalty Report made no mention of prepayment and instead stated that the $900,000 in royalties associated with the warrant amendment had been generated from products that Intervoice had sold and shipped to its customers in Texas. Westelman knew that the falsified Royalty Report would be provided to Speechworks' auditors.

37.      The $900,000 should not have been recognized as revenue under Speechworks' policies or GAAP. Under GAAP, because Speechworks had obtained the money for amending the Warrant, the $900,000 should have been recognized as additional paid in capital for modifying an outstanding equity agreement. In addition, under its publicly disclosed revenue recognition policy, Speechworks could not recognize revenue from royalties from OEMs that licensed its software until the OEM had sold the software to end users. Because the $900,000 did not related to sales of software to end customers, Speechworks should not have recognized the payment as revenue.

38.      The improper recognition of the $900,000 resulted in the public dissemination of false and misleading financial and other information in Commission filings and other

communications, including, Speechworks' Form 10-Q for the first quarter of fiscal 2001, which was filed with the Commission on May 14, 2001, a press release dated April 24, 2001, and an earnings call on April 24, 2001.

39.     In connection with his responsibility as Speechworks' CFO, Westelman met with the company's auditors throughout the course of the quarter and in quarter-end and year-end review and audit closing meetings.  During the relevant period, the auditors inquired during the course of their reviews and audits, whether Speechworks had engaged in any unusual transactions.  Westelman knew of and generally followed Speechworks' custom and practice to discuss unusual, material transactions with its outside auditors.   Even though the $900,000 was undocumented, contained unusual terms, and was outside the scope of the existing arrangement with Intervoice, Westelman neither discussed nor disclosed the deal to the auditors nor directed any subordinates to have such discussions.

40.     Moreover, even though Westelman knew Speechworks' auditors reviewed and relied upon the Royalty Report when conducting their audits and reviews, he did not disclose that the document was false and misleading in that a substantial portion of the royalties did not relate to products shipped to third parties.  Westelman also signed a false and misleading representation letter provided to the company's outside auditors that incorporated by reference a representation that he did not know "of any side letters or oral arrangements with customers that would modify or supersede the terms of the purchase orders and/or agreements with these customers or would otherwise impact the recognition and/or classification of the related revenues."

VI.     **The Third Intervoice Transaction: The May
        2001 $2 Million Royalty Prepayment Agreement**

41.     During the last three quarters of 2001, as a result of Westelman's and Forman's conduct, Speechworks fraudulently recognized $2 million in royalty prepayments from

Intervoice as revenue. The transaction arose in late May 2001 when Graham contacted Westelman to determine whether Speechworks would purchase $1 million in hardware systems from Intervoice in advance of receiving final orders for its customers. After discussing the matter internally, Westelman informed Graham that Speechworks would purchase the hardware even though it did not have confirmed orders for the products, provided that: (1) Intervoice agreed to adjust the systems' configurations or to substitute new systems to meet the needs of Speechworks' eventual end users; and, (2) Intervoice agreed to prepay for up to $2 million of unspecified royalties over the next three quarters. Graham accepted Westelman's terms at the end of May 2001.

42.     Under the terms of the arrangement reached with Westelman, Graham agreed that the amount of royalties for which Intervoice would be obligated to prepay would depend on the amount of actual royalties Intervoice generated for Speechworks during a given quarter based on sales to third parties. Westelman proposed a sliding scale in a May 30, 2001 email (the "May 30 Email") that was orally adopted by the parties and which included a commitment by Intervoice to prepay for up to $2 million of royalties over three quarters, with stipulations as follows: (1) if core business in a quarter amounted to actual royalties of less than $500,000, Intervoice would add $1 million in prepaid royalties to the quarterly Royalty Report; (2) if core business in a quarter amounted to actual royalties of between $500,000 to $750,000, Intervoice would add $750,000 in prepaid royalties to the quarterly Royalty Report; (3) if core business in a quarter amounted to actual royalties of between $750,000 to $2 million, Intervoice would add $500,000 in prepaid royalties to the quarterly Royalty Report; and, (4) if core business in a quarter amounted to actual royalties over $2 million, no additional prepaid royalties needed to be added to the quarterly Royalty Report and $500,000 of the $2 million prepaid royalty commitment

would be cancelled.  "Core business" as used in the May 30 Email meant actual sales of software to third parties that gave rise to a royalty obligation under the OEM Agreement between Speechworks and Intervoice.

43.    After negotiating the prepaid royalty agreement with Graham, Westelman met with Forman and Haberman and asked them to assist him in evaluating revenue recognition for the arrangement.  Forman and Haberman then learned that the deal was essentially an oral agreement between Westelman and Graham, wherein Intervoice was prepaying up to $2 million in royalties in advance of sales to third parties, and that the amount of the royalty prepayment was a sliding scale consistent with what was contained in the May 30 Email.

44.    Both Forman and Haberman were also concerned about and discussed the lack of proper documentation associated with the Intervoice prepayment deal with Westelman.  The May 30 Email was the only writing which memorialized any terms of the prepaid agreement between Westelman and Graham.  The May 30 Email, which was described to Forman and Haberman, failed on its face, however, to provide sufficient evidence of the essential elements of the arrangement for revenue recognition purposes under GAAP and Speechworks' publicly disclosed revenue recognition policy.  The May 30 Email was inadequate for revenue recognition purposes because it was not signed by Intervoice and did not address all key terms and conditions (e.g., products, pricing, delivery).

45.    The lack of written documentation coincided with the limited detail in the actual oral agreement between Westelman and Graham.  The oral agreement essentially provided that Intervoice would prepay up to $2 million of royalties to Speechworks over three quarters and in return would obtain a credit that it could use to satisfy future royalty obligations for unspecified products.  The oral agreement failed to define: (1) what specific product royalties the prepaid

credit could be used to satisfy; (2) when the prepaid credit could first be used; (3) if the prepaid credit could be used to satisfy all or just some of the royalties owed in a given quarter; or, (4) if the prepaid credit would ever expire.

46.     Westelman and Forman knew that under GAAP and Speechworks' publicly disclosed revenue recognition policy, the essential terms and conditions of a transaction were required to be agreed upon before the end of a quarter in which the revenue was recognized and had to be documented in a signed writing.  Westelman and Forman also knew that Speechworks' publicly disclosed revenue recognition policy stated that the company recognized revenues on royalties from OEMs in connection with sales of software to third parties.

47.     Westelman and Forman, while knowingly or recklessly disregarding the lack of documentation and the departure from Speechworks' OEM revenue recognition guidelines, allowed Speechworks to improperly record Intervoice's royalty prepayments as revenue in the quarters in which Intervoice committed to make the payments.  Westelman and Forman knowingly or recklessly failed to require Speechworks to properly defer the revenue associated with the prepaid royalties to the periods in which the prepaid credit was actually used to satisfy a royalty obligation.

48.     In addition to knowingly or recklessly disregarding the lack of documentation and the departure from Speechworks' reported policy of recognizing revenue from OEMs, Forman knowingly or recklessly ignored several red flags that pointed to a need for further scrutiny prior to recognizing the Intervoice prepaid royalties.

49.     Firstly, Intervoice included $1 million, $500,000 and $500,000 of prepaid royalties in the Royalty Reports that it sent to Speechworks for the three month periods ended May 31, 2001, August 31, 2001 and November 31, 2001 (Intervoice's first, second and third

quarters of fiscal 2002 respectively), which showed total royalties owed of $1.48 million, $2.08 million, and $1.31 million respectively. These Royalty Reports failed to identify the prepayments as prepaid royalties; rather, the prepayments were listed as actual royalties which Intervoice had generated for Speechworks through the sale and shipment of software to Intervoice customers in Texas. The cover letters accompanying the Royalty Reports also stated that the report reflected royalties for products that Intervoice had shipped to its customers.

50.     Secondly, Forman knew that the unusual Intervoice royalty prepayment arrangement, contrary to Speechworks' custom and practice, was not vetted with or approved by the company's outside auditors prior to their inclusion in the company's financials. In fact, although Forman was engaged in discussions with the outside auditors about revenue recognition for several other unusual situations during May, June and July of 2001 -- some of which involved substantially smaller amounts of revenue -- he chose not to engage the auditors in a dialogue about the Intervoice prepaid royalties and knew that no one else from the company had done so either.

51.     Thirdly, Forman knew that Intervoice may have tried in the past to recognize revenue improperly on advance hardware sales it had made to Speechworks, thus calling for a higher level of skepticism on any unique deals involving Intervoice. Forman knew that in or around the second quarter of 2001, Speechworks had bought $1 million worth of hardware from Intervoice – a number equal to the first royalty prepayment amount – in advance of receiving final customer orders.

52.     Finally, Forman knowingly or recklessly disregarded what appeared to be economically irrational conduct by Graham in his agreement to prepay for

$2 million of royalties.  Forman knew that Intervoice was not otherwise obligated to pay royalties to Speechworks upon the sale of Speechworks' software products to third parties. Forman was provided with no economic justification as to why Intervoice suddenly decided to prepay for up to $2 million worth of unspecified royalties.  For example, Forman was not led to believe, nor was it actually the case, that Intervoice received any special pricing concessions as part of Westelman's and Graham's oral arrangement.

53.    Haberman, with the same knowledge of the relevant facts and circumstances as Forman, improperly recorded Intervoice's royalty prepayments as revenue in the quarters in which Intervoice committed to make the payments.

A.    **Overt Acts Undertaken in Furtherance of the Scheme**

54.    During the relevant period, Westelman and Forman undertook a series of overt acts in furtherance of the fraudulent scheme.   The acts go beyond the mere intellectual decision to acquiesce in allowing Speechworks to improperly recognize Intervoice's royalty prepayments or the actual making of misstatements to investors.

55.    Westelman and Forman signed and provided the auditors with false and misleading management representation letters for the second and third quarters and fiscal year 2001, dated August 14, 2001, November 12, 2001 and January 30, 2002 respectively.  The January 30, 2002 letter falsely stated, in pertinent part, that Westelman and Forman did not know "of any side letters or oral arrangements with customers that would modify or supersede the terms of the purchase orders and/or agreements with these customers or would otherwise impact the recognition and/or classification of the related revenues."  The other two letters incorporated by reference similar representations.  These letters were false and misleading because Westelman and Forman knew or recklessly disregarded the fact that o disclosure had been made to the

auditors in regards to Westelman's oral side deal with Graham that was outside the bounds of the OEM Agreement, and had led to the recognition of $2 million in royalty prepayments.

56.    Westelman and Forman failed to inform Speechworks' auditor that the while in the past, Intervoice's Royalty Reports only listed royalties for products sold to third parties, the Intervoice Royalty Reports for Speechworks' second, third and fourth quarters of 2001 (dated May 31, 2001, August 31, 2001, and November 30, 2001 respectively) falsely reflected prepaid royalties for products that had not shipped to end users

57.    During the relevant period, Westelman and Forman employed a practice when dealing with unusual, non-standard contracts, to involve Speechworks' outside auditors in the contracting process, so as to avoid any revenue recognition issues.  Speechworks outside auditors also questioned Westelman and Forman about the existence of unusual transactions on at least a quarterly basis and made it clear that they expected the officers to bring such matters to their attention.  Westelman and Forman knew that the Intervoice prepaid arrangement was an unusual agreement because, among other reasons: (1) it was the first time that Speechworks had a contract with a party that provided for a prepaid credit to be built up for future unspecified use; (2) it was essentially an oral agreement; and, (3) its size alone was material. Westelman and Forman deviated from the standard practice, however, and did not disclose or discuss the unusual Intervoice prepaid arrangement with Speechworks' auditors in 2001, either as a proactive measure to check their revenue recognition analysis or in response to the quarterly questioning about unusual transactions. Moreover, as far as Westelman and Forman understood, no one else at the company had disclosed the Intervoice prepaid transaction in to the outside auditors in 2001.  Although Westelman and Forman did not disclose the unusual Intervoice prepaid arrangement to their outside auditors, they did discuss revenue recognition issues associated with

several other transactions – at least two of which involved less revenue than the Intervoice

prepayment arrangement – during May, June and July 2001.

58.    In early 2003 during the course of the year end 2002 audit, Speechworks' auditor

noticed a 30% reduction on a Royalty Report and convened a meeting with Westelman, Forman

and Haberman.  Westelman, in the company of Forman and Haberman, conveyed the false

impression to the auditors that Intervoice had finalized a deal with an end customer and the deal

fell through, and that Speechworks provided a 30% discount in an amount related to the failed

transaction as an after-the-fact business accommodation to help a valued partner.  In fact, as

Westelman and Forman knew, the purported 30% discount was not a "discount" at all, but rather

was a negotiated bleed-down of the prepayment balance.

**B.    False Statements by Westelman and Forman**
**Related to the Third Intervoice Transaction**

59.    Westelman and Forman knowingly or recklessly made numerous materially false

and misleading statements concerning Speechworks' financial metrics and revenue recognition

policies to investors in connection with Speechworks' improper recognition of Intervoice's $2

million of prepaid royalties.  The statements were disseminated to investors through

Speechworks' periodic Commission filings, press releases, and investor conference calls.

Westelman and Forman's roles in connection with the preparation, review, signing and

distribution of the periodic Commission filings (e.g. Forms 10-Q and 10-K), quarterly earnings

press releases, and quarterly earning calls is described above in paragraphs 22 to 26 and

incorporated by reference in this subsection.

60.    The Form 10-Q for the period ended June 30, 2001 that was filed with the

Commission on August 14, 2001, the quarterly earnings press release dated July 18, 2001, and

the quarterly earnings call on July 18, 2001, contained materially misstated financial information

including, but not limited to, the overstatement of revenue for the three months ended June 30, 2001 by 11% and the overstatement of product license revenue for the same period by 21%.

61.     The Form 10-Q for the period ended September 30, 2001 that was filed with the Commission on November 14, 2001, the quarterly earnings press release dated October 24, 2001, and the quarter-end earnings call on October 24, 2001 contained materially misstated financial information including, the overstatement of revenue for the three months ended September 30, 2001 by 5% and the overstatement of product license revenue for the same period by 8%.

62.     The Form 10-K for the period ended December 31, 2001 that was filed with the Commission on March 20, 2002, the quarter/year-end press release dated January 30, 2002, and the quarter/year-end earnings call on January 30, 2002 contained material misstated financial information including, but not limited to: 1) the overstatement of revenue for the three months ended December 31, 2001 by 5% and the overstatement of product license revenue for the same period by 8% for the quarter; and 2) the overstatement of revenue by 7% and the overstatement of license revenue by 13% for the year.

63.     In addition to misreporting financial metrics due to the prepaid royalties, Speechworks' Forms 10-Q for the second and third quarters of 2001 and the Form 10-K for 2001 falsely stated that the increases in product license revenues as compared to prior periods were due to, *inter alia*, "growing market acceptance" by end users and "improved productivity" of OEMs like Intervoice.  Westelman and Forman failed to tell investors, however, that a substantial portion of Speechworks' product license revenues in the last three quarters of 2001 were obtained by engaging in a form of virtual channel stuffing with Intervoice and had noting to do with growing market acceptance or OEM productivity.

64.    Westelman's and Forman's misrepresentations were compounded by the fact that the improperly recognized revenue involved sales to Intervoice.  As Westelman and Forman were aware, royalties from Intervoice constituted Speechworks' largest revenue source, accounting for 16.1% of the company's revenue in 2000 and 19.3% of the company's revenue in 2001.  During earnings calls at the end of the second, third and fourth quarters of 2001, Westelman, using a script prepared by Forman, specifically discussed sales to Intervoice, noting that the substantial royalty revenues from Intervoice reflected sales to Intervoice's end customers and positive market demand for Speechworks' products.  Similar sentiments were expressed in the Forms 10-Q for the second and third quarters of 2001 and the Form 10-K for 2001.  Westelman and Forman, however, knowingly or recklessly disregarded the fact $2 million in royalties from Intervoice in the last three quarters of 2001 were prepays and had nothing to do with market demand.

65.    Speechworks' failure to follow its publicly disclosed revenue recognition policy violated GAAP.  Under GAAP, a company must apply consistent accounting across reporting periods.  Accounting Principles Board Opinion 22 provides, in pertinent part, that the accounting policies adopted by a company can significantly affect the presentation of its financial position, and notes that usefulness of the financial statements depends upon the users understanding of the company's accounting policies.  As such, by failing to disclose its true revenue recognition policy, Westelman and Forman misled investors regarding Speechworks' financial position and limited the usefulness of its published financial statements.

66.    Westelman and Forman knew, or were reckless in not knowing, that distinction between a "sales in" revenue recognition policy (i.e. sales to the resellers/OEMs) and a "sales through" revenue recognition policy (i.e. sales to the resellers/OEMs' customers) was material to

investors.  Indeed, in 2003, Forman and Westelman modified Speechworks' revenue recognition policy in the 10-K for fiscal 2002.  Specifically, the revised revenue recognition policy stated that for royalty reporting OEMs (like Intervoice), Speechworks' "*typically* recognize[d] the revenue from these royalties upon delivery to the third party. . . ."

### C.    The 70/30 Agreement

67.    By the end of 2001, Intervoice had built up a $2 million royalty credit.  Graham told Westelman that Intervoice was considering using the prepaid credit all at once, wiping out any royalty revenue for several quarters.

68.    On March 20, 2002, Graham and Westelman reached a agreement that going forward, Intervoice could pay for up to 30% of a current quarter's royalty obligation by drawing down on the $2 million credit that it had established in the last three quarters of 2001 (the "70/30 Agreement").  By way of example, for every $1 million in future royalties Intervoice owed Speechworks, Intervoice would pay Speechworks $700,000, and reduce its royalty prepayment credit balance by $300,000.

69.    Intervoice first took advantage of the 70/30 Agreement in the Royalty Report dated May 31, 2002, and continued to rely upon on the prepaid royalty credit to meet its royalty obligations to Speechworks at least through the end of 2003.

70.    Westelman and Forman failed to contemporaneously disclose the 70/30 Agreement to the company's auditors or investors.  The failure to disclose the agreement constituted a material omission because, as Westelman and Forman knew, Intervoice was the company's largest revenue source in 1999, 2000, and 2001.  By failing to disclose the prepayments, Speechworks failed to disclose that revenue from Intervoice could drop significantly in future periods.

**VII.    Impact of the Improperly Accounted For Transactions.**

71.    Below is a chart showing the cumulative impact by reporting period of all of the above discussed improper transactions in a given reporting period on Speechworks' reported revenue numbers.   The "Restated" numbers show what the specific financial metrics should have been if the improperly recognized transactions described above in a given period were reported correctly.

| Period Ended | Reported Revenue (thousands) | Restated Revenue (thousands) | Revenue Overstatement (thousands) | % Change |
|---|---|---|---|---|
| Three Months Ended 3/31/01 | $10,863 | $9,963 | $900 | 9% |
| Three Months Ended 6/30/01 | $10,240 | $9,240 | $1,000 | 11% |
| Three Months Ended 9/30/01 | $10,945 | $10,445 | $500 | 5% |
| Three Months Ended 12/31/01 | $11,088 | $10,588 | $500 | 5% |
| Twelve Months Ended 12/31/01 | $43,136 | $40,236 | $2,900 | 7% |

72.    Below is a chart showing the cumulative impact by reporting period of all of the above discussed improper transactions in a given reporting period on Speechworks' reported product license revenues.  During the relevant period, the product license segment was the largest component of Intervoice's reported revenues and was discussed separately in period Commission filings, quarterly earnings press releases and quarterly earnings calls   The

"Restated" numbers show what the specific financial metrics should have been if the improperly recognized transactions described above in a given period were reported correctly.

| Period Ended | Reported Revenue (thousands) | Restated Revenue (thousands) | Revenue Overstatement (thousands) | % Change |
|---|---|---|---|---|
| Three Months Ended 3/31/01 | $6,092 | $5,192 | $900 | 17% |
| Three Months Ended 6/30/01 | $5,806 | $4,806 | $1,000 | 21% |
| Three Months Ended 9/30/01 | $6,908 | $6,408 | $500 | 8% |
| Three Months Ended 12/31/01 | $7,031 | $6,531 | $500 | 8% |
| Twelve Months Ended 12/31/01 | $25,837 | $22,937 | $2,900 | 13% |

## VIII.    Securities Offered in 2001 and 2002

73.    Westelman and Forman had Speechworks offer its securities for sale in at least 2001 and 2002 through various employee stock option plans at the same time as Speechworks financial statements and other public pronouncements contained materially false and misleading information.

74.    On August 9, 2000, Speechworks filed with the Commission a Form S-8 registering several million shares of stock to be offered pursuant to employee stock option plans. The Form S-8 incorporated by reference all of Speechworks' Commission filings to be made in the future. Westelman signed the Form S-8.  The Form S-8 was effective at least through 2002. As discussed above, Westelman and Forman knowingly or recklessly made numerous materially false and misleading statements concerning Speechworks' financial metrics and revenue

recognition policies to investors in a variety of Commission filings in 2001 and 2002. Westelman and Forman knowingly or recklessly allowed these materially misleading Commission filings to be incorporated by reference into the previously filed Form S-8.

## IX.    Stock Sales by Forman during 2002 through 2003

75.    On February 13, 2002, May 22, 2003, May 28, 2003, May 29, 2003 and June 2, 2003, Forman sold Speechworks' stock while in possession of material, non-public information concerning Speechworks' financial condition (including but not limited to the information, described above, reflecting that Speechworks had materially overstated its revenue during fiscal 2001) without publicly disclosing that information prior to the stock sales. Forman owed a fiduciary duty to shareholders to disclose or to correct the misleading financial information prior to selling his stock.

## X.    Notice of a Potential Action

76.    Prior to August 2004, the defendants took actions to prevent the public and the Commission from finding out about the fraud described herein, by among other things, concealing their activities from investors and the company's outside auditors. On or about August 3, 2004, counsel for the audit committee of ScanSoft, Speechworks' successor, informed the staff of the Commission that it had been retained to conduct an internal investigation into transactions entered into by Speechworks that may have been incorrectly booked as revenue. On or about August 8, 2004, ScanSoft publicly announced, among other things, that it would restate Speechworks previously reported financial results for the fiscal years 2000 through 2002, and the first six months of 2003, and identified some of the transactions at issue in this action. On or about October 8, 2004, ScanSoft's audit committee provided the Commission staff with the results of its internal investigation.

77.     On December 21, 2005, Forman executed a tolling agreement with the

Commission in which he agreed that any statute of limitation applicable to any action or

proceeding against him brought by or on behalf of the Commission was tolled and suspended for

the period beginning on January 1, 2006 through midnight on September 1, 2006 (the "tolled

period"). Forman also agreed that he would not assert any statute of limitations as a defense to

any action or proceeding brought by or on behalf of the Commission in the future, such that the

calculation of the time period for any such defense included the tolled period.  In September,

2006, Forman extended the tolled period through to December 31, 2006.  On December 1, 2006,

Forman extended the tolled period again through to March 31, 2007 (*i.e.*, the entire tolled period

includes January 1, 2006 through March 31, 2007).

## FIRST CLAIM

**(Against Westelman and Forman)**
**Fraud in Connection With the Purchase or Sale of Securities in**
**Violation of Exchange Act Section 10(b) and Rule 10b-5**

78.     Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

79.     As set forth more fully above, Westelman and Forman participated in a fraudulent

scheme to artificially inflate Speechworks' revenue and falsify Speechworks' financial

disclosures.  Westelman and Forman undertook a series of fraudulent acts to further the scheme.

Westelman and Forman also had Speechworks recognize revenue and report a number of

transactions that Westelman and Forman knew, or were reckless in not knowing, violated GAAP

and Speechworks' disclosed accounting policies. Westelman and Forman knowingly or

recklessly made materially false and misleading statements in Forms10-Q and 10-K, filed with

the Commission in 2001, 2002 and 2003, and other public disclosures when they knew or were

reckless in not knowing that these filings and other public statements were materially false and misleading.

80.     By reason of the foregoing, Westelman and Forman, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means and instrumentalities of interstate commerce, or of the mails, or any facility of any national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of Intervoice securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

81.     The conduct of Westelman and Forman involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### SECOND CLAIM
**(Westelman and Forman)**
**Fraud in the Offer or Sale of Securities in Violation of Securities Act § 17(a)**

82.     Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

83.     As set forth more fully above, Westelman and Forman participated in a fraudulent scheme to artificially inflate Speechworks' revenue and falsify Speechworks' financial disclosures.  Westelman and Forman undertook a series of fraudulent acts to further the scheme. Westelman and Forman also had Speechworks recognized revenue in a number of transactions that Westelman and Forman knew, or were reckless in not knowing, would violate GAAP and

Speechworks' policies. Westelman and Forman made materially false and misleading statements in Forms10-Q or 10-K, filed with the Commission in 2001, 2002 and 2003, and other public disclosures when they knew or were reckless in not knowing that these filings and other public statements were materially false and misleading.

84.    During at least 2001 and 2002, Speechworks offered registered securities pursuant to a July 2000 S-8 Registration Statement that Westelman and Forman were involved with and which incorporated subsequently filed materially false and misleading Forms10-Q or 10-K, filed with the Commission in 2001, 2002 described above.

85.    By reason of the foregoing, Westelman and Forman, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication  in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon certain purchasers, including purchasers of Intervoice securities, in violation of Section 17(a) of the Securities Act  [15 U.S.C. §77q(a)].

### THIRD CLAIM
**(Westelman and Forman)**
**Circumvention of Internal Controls and Falsification of Accounting Records**
**In Violation of Exchange Act § 13(b)(5) and Rule 13b2-1**

86.    Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

87.    By reason of the foregoing, Westelman and Forman knowingly circumvented Speechworks' internal accounting controls; or, directly or indirectly, falsified, or caused to be falsified, Speechworks' books, records and accounts in violation of Section 13(b)(5) of the

Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FOURTH CLAIM
### (Westelman, Forman and Haberman)
### Aiding and Abetting Speechworks' Reporting
### Of False and Misleading Information in Annual Statements in Violation of
### Exchange Act §13(a) and Rules 12b-20 and 13a-1

88.    Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

89.    Speechworks reported materially false and misleading information and made other false and misleading statements in its Form10-K for the period ended December 31, 2001, filed with the Commission on March 20, 2002. Moreover, the materially false and misleading information was repeated in Speechworks' Form 10-K for fiscal 2002, filed with the Commission on March 26, 2003.

90.    Westelman, Forman and Haberman knew, or were reckless in not knowing, that Speechworks' conduct was improper, and knowingly and substantially assisted Speechworks to report materially false and misleading information in its Forms 10-K filed with the Commission on March 20, 2002, as well as in Speechworks' Form 10-K filed for fiscal 2002 filed with the Commission on March 26, 2003.

91.    By reason of the foregoing, Westelman, Forman and Haberman aided and abetted Intervoice's violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R.  §§ 240.12b-20 and 240.13a-1], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## SIXTH CLAIM
### (Westelman, Forman and Haberman)
### Aiding and Abetting Speechworks' Reporting
### Of False and Misleading Information in Quarterly Reports in Violation of
### Exchange Act §13(a) and Rules 12b-20 and 13a-13

92.    Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

93.    Speechworks reported materially false and misleading information in its Forms 10-Q for the periods ended March 31, 2001, June 30, 2001, and September 30, 2001, filed with the Commission on May 14, 2001, August 14, 2001 and November 14, 2001 respectively. Moreover, the materially false and misleading information was repeated in Speechworks' Forms 10-Q for the first three quarters of 2002, filed with the Commission on May 15, 2002, August 14, 2002, and November 14, 2002 respectively.

94.    Westelman, knew or was reckless in not knowing, that Speechworks' conduct was improper, and knowingly and substantially assisted Speechworks to report materially false and misleading information in its Forms 10-Q filed with the Commission on May 14, 2001, August 14, 2001 and November 14, 2001, as well as in Speechworks Forms' 10-Q for the first three quarters of 2002, filed with the Commission on May 15, 2002, August 14, 2002, and November 14, 2002 respectively.

95.    Forman and Haberman knew, or were reckless in not knowing, that Speechworks' conduct was improper, and knowingly and substantially assisted Speechworks to report materially false and misleading information in its Forms 10-Q filed with the Commission on August 14, 2001 and November 14, 2001, as well as in the Forms 10-Q filed for the second and third quarters of 2002, filed with the Commission on August 14, 2002, and November 14, 2002 respectively.

96.    By reason of the foregoing, Westelman, Forman and Haberman aided and abetted Speechworks' violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-13], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

32

**SEVENTH CLAIM**
**(Westelman, Forman and Haberman)**
**Aiding and Abetting Speechworks' Maintenance of False and Misleading Books and**
**Records in Violation of Exchange Act § 13(b)(2)(A)**

97.     Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

98.     As described above more fully, Speechworks maintained false and misleading

books and records, which, among other things, materially overstated the company's quarterly

and year-end 2001 revenues.

99.     Westelman, Forman and Haberman knew, or were reckless in not knowing, that

Speechworks' conduct was improper, and knowingly and substantially assisted Speechworks to

keep and maintain false and misleading books and records.

100.    By reason of the foregoing, Westelman, Forman and Haberman aided and abetted

Speechworks' violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §

78m(b)(2)(A)], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

§ 78t(e)].

**EIGHTH CLAIM**
**(Westelman, Forman and Haberman)**
**Aiding and Abetting Speechworks' Failure to Maintain Internal Controls**
**In Violation of Exchange Act § 13(b)(2)(B)**

101.    Plaintiff Commission repeats and realleges paragraphs 1 through 77_ above.

102.    Speechworks failed to devise and maintain a system of internal accounting

controls sufficient to provide reasonable assurances that the company's transactions were

recorded as necessary to permit preparation of financial statements in conformity with GAAP.

103.    Westelman, Forman and Haberman knew, or were reckless in not knowing, that

Speechworks' conduct was improper, and each knowingly and substantially assisted

Speechworks' failure to devise and maintain a system of internal accounting controls sufficient

to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

104.    By reason of the foregoing, Westelman, Forman and Haberman aided and abetted Speechworks' violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## NINTH CLAIM
### (Westelman and Forman)
### Violations of Exchange Act Rule 13b2-2

105.    Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

106.    Westelman and Forman were officers of Speechworks who, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with, or omitted to state, or caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit, review or examination of the financial statements of Speechworks required to be made pursuant to the Exchange Act or the preparation or filing of any document or report required to be filed with the Commission pursuant to the Exchange Act or otherwise.

107.    By reason of the foregoing, Westelman and Forman violated Exchange Act Rule 13b2-2 [17 C.F.R.  §§ 240.13b2-2], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## TENTH CLAIM
### (Forman)
### (Aiding and Abetting Speechworks' Violations of Section 10(b)
### Of the Exchange Act and Rule 10b-5)

108.    Plaintiff Commission repeats and realleges paragraphs 1 through 77above.

109.    As set forth above, Speechworks violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

110.    As set forth above, Forman knew, or was reckless in not knowing, that Speechworks' conduct was improper and he knowingly and substantially assisted Speechworks' uncharged violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

111.    By reason of the foregoing, Forman aided and abetted Speechworks' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## ELEVENTH CLAIM
### (Westelman)
### (Aiding and Abetting Intervoice's Violations of Section 10(b) Of the Exchange Act and Rule 10b-5)

112.    Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

113.    As set forth above, Intervoice violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

114.    As set forth above, Westelman knew, or was reckless in not knowing, that Intervoice's conduct was improper and he knowingly and substantially assisted Intervoice's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder .

By reason of the foregoing, Westelman aided and abetted Speechworks' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## TWELFTH CLAIM
### (Haberman)
### Circumvention of Internal Controls and Falsification of Accounting Records
### In Violation of Exchange Act § 13(b)(5) and Rule 13b2-1

115.     Plaintiff Commission repeats and realleges paragraphs 1 through 77 above.

116.     By reason of the foregoing, Haberman directly or indirectly, falsified, or caused to be falsified, Speechworks' books, records and accounts in violation of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final Judgment:

## I.

Permanently enjoining Westelman and Forman from violating, directly or indirectly:

a.     Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

b.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

c.     Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

d.     Section 13(a) of the Exchange Act [15 U.S.C.  §§ 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R.  §§ 240.12b-20, 240.13a-1, and 240.13a-13]; and

e.     Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C.  §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

**II.**

Permanently enjoining Haberman from violating, directly or indirectly:

    a.         Section 13(a) of the Exchange Act [15 U.S.C.  §§ 78m(a)] and Rules 12b-20, 13a-1,13a-13 and 13b2-1 thereunder [17 C.F.R.  §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.13b2-1]

    b.         Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C.  §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

**III.**

Permanently prohibiting Westelman and Forman from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**IV.**

Requiring Westelman , Forman and Haberman to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,


 /s/  R. Daniel O'Connor
R. Daniel O'Connor (RO5217)
  Senior Trial Counsel
  oconnord@sec.gov
Asita Obeyesekere
  Senior Enforcement Counsel
  obeyesekerea@sec.gov
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8979
(617) 573-4590 fax

Dated: June 21, 2007