UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-11151-RWZ

SECURITIES AND EXCHANGE COMMISSION

v.

STEVEN FORMAN

MEMORANDUM OF DECISION

June 9, 2010

ZOBEL, D.J.

Speechworks International ("Speechworks"), in May 2001, entered into an agreement with a long-term business partner, InterVoice-Brite, Inc. ("Intervoice") whereby Intervoice, which sold Speechworks software to end users, would prepay $2 million for software licenses in advance of sales to end users.  Speechworks recognized this revenue upon receipt from Intervoice rather than, as had been past practice, upon sale to the end user.  Speechworks was subsequently purchased by Scansoft, Inc.  Scansoft conducted an investigation of past accounting, concluded the prepay revenue was improperly recognized, and restated the earlier financials.

The SEC also initiated an investigation of Speechworks' accounting and ultimately brought this securities fraud lawsuit against three defendants including Steven Forman, the controller at Speechworks during the relevant time.  The SEC alleges that the accounting treatment of the $2 million payment violated GAAP and a

published revenue recognition policy.[1]  The other defendants have settled; only Forman

remains in the case.  He and the SEC have filed cross-motions for summary judgment.

## I.   Background

Speechworks developed and licensed speech recognition software and provided

associated professional services.  The company's shares were traded on the NASDAQ

stock exchange following an August 2000 initial public offering.  Scansoft purchased

Speechworks in April 2003.

In 1996 Speechworks signed an original equipment manufacturer agreement,

titled the "OEM Agreement," with Intervoice.  The OEM Agreement gave Intervoice the

right to modify, sublicense, and distribute Speechworks products to end users.   The

company was not, itself, an end user.  Intervoice sales became a large, and at times

the largest, source of revenue for Speechworks.  Per the OEM Agreement, Intervoice

notified Speechworks of these sales with a quarterly royalty report.  These reports

listed product that had been "shipped."  Payment of the amount due was included with

each report.

In 2001, Richard Westelman, Speechworks Chief Financial Officer ("CFO"),

negotiated an extraordinary agreement with Rob Roy Graham, Intervoice's CFO.

Intervoice agreed to pay for $2 million in software licenses in advance of sales to end

users (the "prepaid transaction").  It was bidding on a project with Bank of America

---

[1]GAAP is the acronym for Generally Accepted Accounting Principles, official standards of accounting promulgated by the Federal Accounting Securities Advisory Board.  The SEC treats GAAP as the authoritative standard.  <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 160 n.4 (2d Cir. 2000); 17 C.F.R. § 210.4-01(a)(1).

which was expected to utilize some or all of these licenses.  Although Intervoice had

not yet sold these licenses, Westelman and Graham agreed that the transaction would

be reported on the royalty reports to Speechworks.  Intervoice included $1 million on

the second quarter 2001 report, $500,000 on the third quarter 2001 report, and

$500,000 on the fourth quarter 2001 report.  The royalty reports which listed this

revenue did not indicate that the software licenses had been purchased in advance of

sale to an end user.  Nor were the terms of the prepaid transaction memorialized in any

document.

Intervoice did not receive the anticipated business with Bank of America and

was saddled with the $2 million in licenses without an end user.  This raised the

possibility that Speechworks would receive no revenue from Intervoice until this stock

of licenses was depleted.  Westelman and Graham decided in the spring of 2002 that

Intervoice would take a 30% reduction on future royalties until the $2 million was

exhausted.

A.    Revenue Recognition

Speechworks recognized the revenue from the prepaid transaction in the

quarters it was reported on the royalty reports, and then publicly disseminated those

revenue figures in the 2nd and 3rd quarter 2001 Form 10-Q filings and 2001 Form 10-K

filing, and associated press releases and conference calls.[2]  None of these public

communications disclosed that Speechworks' revenue figures included the income from

---

[2]The 10-Q and 10-k are, respectively, quarterly and annual reports required by
the SEC.  They include financial statements, financial analysis, risk disclosures, and
information about internal controls.

the prepaid transaction, a transaction which had the effect of inflating present revenue at the expense of future revenue.  The auditor, PricewaterhouseCoopers ("PwC"), was also not informed of the prepaid component of Speechworks' royalty figures.

Scansoft, after purchasing Speechworks, investigated certain transactions negotiated by Westelman including that with Intervoice and concluded that the prepaid revenue was improperly recognized.  It thereupon, in 2004, restated the earlier financials and shifted revenue to quarters when the licenses were sold to end users.

Defendant Forman, who joined Speechworks as the controller in 1999, and Arthur Haberman, who was director of finance, were involved in the decision to recognize the prepaid revenue.  As controller, Forman was responsible for the proper accounting and maintenance of the company's books and the preparation of financial statements.  Haberman reported directly to Forman and he had primary responsibility for corporate accounting prior to Forman's arrival.  Haberman handled revenue recognition decisions on a day-to-day basis but he would bring difficult revenue questions to the attention of Forman or Westelman.

The role Forman played in the decision to recognize this revenue is hotly disputed between the SEC and Forman.  The SEC asserts that Forman was aware that the $2 million payment from Intervoice reflected an advance against future sales of software and actively participated in the recognition decision. Forman claims he had no idea the revenue was prepaid, and his role in recognition was limited to asking Haberman whether revenue was recorded as listed on the royalty reports.

B.    SEC Investigation

The SEC initiated an investigation of Speechworks' accounting for possible securities fraud.  Forman, Westelman, Haberman, and others gave testimony before the SEC in 2005.  The SEC subsequently issued a Wells notice to Forman indicating the agency might bring a civil action against him.[3]  He responded with two Wells submissions.  The SEC then filed this lawsuit in 2007 against Forman, Haberman, and Westelman.  Stated broadly, the SEC alleges that the prepaid revenue was recognized in violation of GAAP and a publicly disclosed revenue recognition policy, and defendants knew that the revenue recognition was improper.  Simultaneously with the filing of the suit both Westelman and Haberman consented to the entry of judgment.  Only Forman remains a defendant.

The SEC filed an eleven-count complaint, nine counts of which are asserted against Forman: (1) securities fraud in violation of SEC rule 10b-5, 17 C.F.R. 240.10b-5; (2) securities fraud in violation of § 17(a) of the Exchange Act of 1933, 15 U.S.C. § 77q(a); (3) falsification of accounting records in violation of SEC rule 13b2-1, 17 C.F.R. 240.13b2-1; (4) aiding and abetting, see 15 U.S.C. § 78t(e), Speechworks' reporting of misleading information in annual statements in violation of SEC rules 12b-20 and 13a-1, 17 C.F.R. §§ 240.12b-20, 13a-1; (6) aiding and abetting Speechworks' reporting of misleading information in quarterly statements in violation of SEC rules

---

[3]The Wells notice is named after John Wells, the chair of an SEC committee which proposed this process in 1972.  The Wells notice issued at the SEC's discretion to inform an individual under investigation that the SEC is considering legislation.  17 C.F.R. § 202.5(c); Enforcement Manual, Securities and Exchange Commission Division of Enforcement 27-30 (Jan. 13, 2010).  The individual may respond with a Wells submission raising arguments or presenting evidence.

12b-20 and 13a-13, 17 C.F.R. §§ 240.12b-20, 13a-13; (7) aiding and abetting in

Speechworks' maintenance of false and misleading records in violation of § 13 of the

Exchange Act of 1934, 15 U.S.C. § 78m(b)(2)(A); (8) aiding and abetting in

Speechworks' failure to maintain internal accounting controls in violation of § 13 of the

Exchange Act of 1934, 15 U.S.C. § 78m(b)(2)(B); (9) making false statements to an

accountant in violation of SEC rule 13b2-2, 17 C.F.R. § 240.13b2-2; and (10) aiding

and abetting Speechworks' securities fraud in violation of Rule 10b-5, 17 C.F.R.

240.10b-5.

The SEC moves for summary judgment (Docket # 35) on those counts which

require only that Forman acted negligently, rather then recklessly or with intent, which

the SEC identifies as the § 13 and Rule 13 counts and, in part, the § 17 counts.

Forman moves for summary judgment (Docket # 38) on all counts.

**II.    Analysis**

Summary judgment should be rendered if there is no genuine dispute of material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The

burden is on the party opposing summary judgment to set out specific facts showing a

genuine issue.  <u>Id.</u>  A dispute is "genuine" only if a reasonable jury could find for the

nonmoving party.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).

The question underlying the case and the motions for summary judgment is the

extent of defendant's knowledge of the prepaid transaction.  Absent this knowledge, the

parties agree, all counts fail.

Forman made statements in his investigative testimony, Wells submissions, and

deposition from which a reasonable jury could conclude that he knew about the transaction.  (See, e.g., Forman Investigative Testimony 73 ("At the time, my recollection was . . . there's this big deal coming for a big bank application . . . to buy licenses up front"), Docket # 36 ex.1; Wells Submission 19 ("These transactions were presented to Messrs. Forman and Haberman as done deals, and neither man was in any position to tell Mr. Westelman that the revenue could not be recognized"), Docket # 47 ex. 78; Forman Dep. 37-38 ("The question was asked in a hallway: . . . "if Intervoice commits to buying a million dollars worth of licenses that are nonrefundable, can we recognize that as revenue?"), Docket # 36 ex. 2; see also Forman Dep. 80 (testifying that Westelman told him about a prepayment deal with Bank of America).)

Forman attacks these statement in three ways.  First, he points out that his investigative testimony and deposition referred to a $1 million transaction, discussed in 2000, in workspace that Speechworks had left prior to the Intervoice transaction, facts all inconsistent with the $2 million, 2001 Intervoice deal.  Second, he asserts that his Wells submission was based on representations made by SEC staff.  Third, he argues that neither Westelman nor Haberman have corroborated the allegation that Forman knew about the deal prior to revenue recognition.

Defendant's arguments have some, though hardly overwhelming, support in the record.  (See, e.g., Def.'s excerpts of Haberman Investigative Testimony 443 (stating that he learned of the prepaid transaction in "late 2001" or 2002), Docket # 47 ex. 71.) A jury could, however, conclude that Forman was simply mistaken as to some specific details of the transaction, such as the dollar amount.  The evidence as to when

Speechworks changed office space is ambiguous.  (Forman Dep. 37-40.)  Westelman

has testified that he believes Forman was aware of the transaction (Westelman

Investigative Testimony 320), although he has no "specific" basis for that belief (Id. at

163).  Finally, it is disingenuous to claim that the Wells submission was based on SEC

representations when the issue is and all along has been Forman's own knowledge.

In sum, the parties vigorously dispute whether Forman knew about the

transaction and both have produced evidence to support their respective contentions.

This, therefore, is a genuine dispute of fact, to be decided by a jury.  Nonetheless,

while the evidence in the record is clearly sufficient to show disputed facts, it is not a

slam dunk.

Because a finding of knowledge is essential to the SEC's case, and knowledge

is in dispute, the SEC's motion for summary judgment is denied.  Forman's motion must

still be addressed.  This memorandum first addresses his arguments concerning the

securities fraud counts brought under Rule 10b-5 and § 17, then those focused on the

false statement counts brought pursuant to Rule 13, and finally those targeting the

aiding and abetting counts.

### A.    Rule 10b-5 and § 17 (Counts 1 and 2)

The elements of an action for securities fraud under Rule10b-5 and § 17 are

substantially the same.  The SEC must establish that Forman (1) engaged in fraudulent

conduct, (2) in connection with the purchase or sale of securities, with (3) the requisite

mental state.  See SEC v. Tambone, 417 F. Supp. 2d 127, 131 (D. Mass. 2006).

Fraudulent conduct includes making false or misleading statements of material fact.  Id.

at 132.  These counts are premised on three sets of statements: first, Speechworks'

2001 second and third quarter 10-Q filings and the 2001 10-k; second, the earnings

report press releases that followed the filings; third, the earnings report conference

calls that followed the filings.  Forman argues that he did not make any of these

statements, the statements were not false or misleading, any false statement was not

material, and he lacked the mental state required for a violation of 10b-5 and §

17(a)(1).[4]  He also identifies two alleged deficiencies specific to the § 17 count.

### 1.    Forman's Statements

Forman prepared the first draft of the 2001 10-Q and 10-K filings, circulated the

drafts for comments, incorporated those comments,  and filed the documents with the

SEC.[5]  The SEC has produced evidence that Forman drafted the financial section of

the earnings report press releases (Westelman Investigative Testimony 89; Forman

Investigative Testimony 52-53), and there is no dispute that he provided the financial

numbers and proofread the releases for accuracy.  His role in preparing the earnings

---

[4]Forman also argues that he did not fail to disclose any information and he did
not engage in a fraudulent scheme, two additional categories of fraudulent conduct, but
in this case any liability for failure to disclose or a fraudulent scheme is subsumed into
the determination of whether he made false statements, as the failure to disclose is the
failure to correct the alleged misstatements, and the fraudulent scheme is the improper
revenue recognition given fraudulent effect by the SEC filings, press releases, and
conference calls (and misrepresentations to the auditors that are the subject of the § 13
counts).

[5]Forman does not dispute his responsibility for the third quarter 2001 10-Q and
the 2001 10-K, but he argues in his motion for summary judgment that he did not
prepare the second quarter 10-Q.  The evidence he cites in support establishes that
another employee prepared the 2000 10-K, not a 2001 10-Q.  (See, e.g., Forman Dep.
47-48.)

report conference call scripts was more limited.  He reviewed the financial numbers for accuracy and provided supporting documentation to Westelman.  Forman did not participate in the calls.

Forman's role in preparing the 10-Q and 10-K filings and, taking all reasonable inferences in the SEC's favor, the earnings report press releases is sufficient for primary liability to attach.  See SEC v. Wolfson, 539 F.3d 1249, 1259-1261 (10th Cir. 2008) (discussing primary liability standard and finding liability where the defendant played an "integral role" in preparing the statements); SEC v. K.P.M.G. LLP, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006) (surveying case law and concluding that "primary liability can attach to a corporate officer for a company's false statement where it can be shown that the officer was sufficiently responsible for making the false statement").  It is a closer determination with the conference calls, as he did not draft the call script, but the SEC's misstatement allegations relate to the financial numbers discussed in the calls, numbers for which Forman was responsible.  This is also sufficient for liability to attach.

### 2.  Improper Revenue Recognition

The SEC alleges that Forman's statements about Speechworks revenue were false or misleading for two reasons.  First, the revenue recognition was inconsistent with GAAP, and second, the recognition was inconsistent with Speechworks' published revenue recognition policy.

### a.  GAAP

GAAP 97-2 sets forth four criteria that must be satisfied before revenue is recognized.  (GAAP 97-2 ¶ 8, Docket # 42 ex. 66.)  The existence of only one criterion, "persuasive evidence of an arrangement," is in dispute.  Both parties interpret "persuasive evidence" to require a writing. (Def.'s Resps. to Pl.'s Statement of Facts ¶ 35; see GAAP 97-2 ¶ 16.)  Forman argues that the Intervoice transaction was documented in the OEM agreement and royalty reports or, alternatively, an email from Westelman to Robert Graham, the CFO of Intervoice.  A review of the documents shows that they do not meet the standard.

The plain language of the OEM agreement and the associated royalty reports links payments to Speechworks with sales by Intervoice, not sales to Intervoice.  "The OEM [Intervoice] will provide a statement to [Speechworks] setting forth the amount of the Product(s) sold by OEM.  Payment by OEM shall be included with such statement." (OEM Agreement § 3(a), Docket # 36 ex. 35.) The royalty reports which list the $2 million in prepaid licenses refer to them as "shipped."  (Royalty Reports, Docket # 36 exs. 22-24; see Haberman Investigative Testimony 454, 36-8.)  Forman does not explain how this language can be reconciled with the prepaid transaction.  (See Pl.'s Expert Report 10, Docket # 44 ex. A.[6])  In addition, Westelman has testified that the

---

[6]Forman has moved to exclude the testimony of the SEC's expert Elisabeth da Silva's because she is insufficiently qualified to give expert testimony.  Ms. da Silva has a CPA and years of professional audit-related experience, she has worked with many corporate executives including "[m]ore than 20" controllers (da Silva Dep. 64, Docket # 44 ex. 2), and she reviewed public filings, PwC audit workpapers, testimony, and authoritative accounting literature (Pl.'s Expert Rep. Attach. B).  She is sufficiently qualified to give expert testimony as to the proper recognition of the prepaid revenue and Forman's responsibilities in relation to that recognition.  Defendant's objections are properly directed at the weight that testimony should be accorded by the finder of fact.

OEM agreement did not cover the Intervoice transaction (Westelman Investigative

Testimony 334) and Haberman has testified that the transaction was not documented

and that Forman voiced concern about a lack of documentation (Haberman

Investigative Testimony 158-59, 454-55).[7]  (See also Wells Submission 39

("[c]oncededly, there was a lack of documentation regarding the pre-paid licenses

transaction").)

The Westelman-Graham email, which defendant dates to May 30, 2001, appears

to be part of a discussion about the pre-paid licensing transaction.  (Docket # 42, ex.

36.)  It proposes various details for the prepaid transaction, and it is no more than a

proposal.  (Id. ("Does this help address the questions of 'how much in a quarter' and

'are they additive ports?'").)  Accordingly, it is not persuasive evidence of the

transaction and the GAAP requirements have not been satisfied.

### b.    Revenue Recognition Policy

Speechworks published a revenue recognition policy in its 2000 and 2001 10-K

filings.  Thus, the 2000 10-K contains the revenue policy that investors would expect to

apply to the 2001 10-Q filings.

The policy states that "the company recognizes revenue in accordance with

[GAAP] Statement of Position 97-2" and explains that "[r]evenue from royalties on sales

---

[7]Forman points to his expert's conclusion that the OEM agreement and royalty reports constituted persuasive evidence of the transaction, but the expert, in the proffered report, never addresses the plain language of the OEM agreement and royalty reports tying payments to sold and shipped product.  (See, e.g., Def.'s Expert Report ¶ 81, Docket # 47 ex. 95.)  The expert also refers to the royalty reports as "false," which is tantamount to conceding the reports were not persuasive evidence of the transaction.  (Id. at ¶ 84.)

of [Speechworks] products by OEMs to third parties is recognized upon delivery to the third party." (Speechworks 2000 Form 10-K at 35, Docket # 36 ex. 15; see Speechworks 2001 Form 10-K at 21-22, Docket # 36 ex. 18.)  In contrast, when the sale is to an end user, value-added reseller, or system integrator the revenue is recognized upon delivery to that party.  (Speechworks 2000 Form 10-K at 35; Speechworks 2001 Form 10-K at 46.[8])

The contract between Speechworks and Intervoice is titled the "OEM AGREEMENT" and Intervoice is defined as the OEM.  (OEM Agreement 1.)  If the prepaid transaction were governed by the OEM agreement, the revenue recognition policy dictates that the revenue be recognized upon delivery to third parties, not, as actually occurred, at the time of sale to Intervoice.  (See Scansoft Restatement 2, (concluding that the revenue "should have been reported as deferred revenue and recorded as license revenue when sold through to end users in later periods"), Docket # 36 ex. 21 .)  Further, Forman has stated that the Intervoice transaction was an exception to the revenue recognition policy.  (Forman Investigative Testimony 109; see Supplemental Wells Submission 9, Docket # 47 ex. 77.)  While Forman points to testimony of Haberman and an email from another Speechworks employee to the effect that the Intervoice arrangement resembled a value added reseller relationship rather

---

[8]Defendant draws a distinction between the 2000 and 2001 10-K filings because a sentence was changed in one of the sections discussing revenue recognition from "by OEMs to third parties" to "by resellers to third parties."  (Compare Speechworks 2000 10-K at 35, with Speechworks 2001 10-k at 46.)  However, the 2001 10-K elsewhere still expressly states that OEM royalty revenues are recognized upon sale to third parties.  (Speechworks 2001 10-K at 22.)

than OEM, that is simply further evidence that the OEM agreement did not encompass the prepaid transaction rather than evidence that OEM revenue was properly recognized.

### 3.     Materiality of the Misstatements

Forman argues that alleged improper revenue recognition in the 2001 3Q 10-Q and 2001 10-K filings was not material, but he does not dispute the materiality of the misstatements in the 2001 2Q 10-Q.  The revenue misstatements are material if there is a substantial likelihood a reasonable investor would have viewed them as significantly altering the total mix of information available.  <u>Basic v. Levinson</u>, 485 U.S. 224, 232 (1988).

The misstatements in the 3Q 10-Q accounted for 4.5% of total revenue and 7.2% of product license revenue.  The misstatements in the 10-K accounted for 4.6% of total annual revenue and 7.7% of annual product license revenue.[9]  Speechworks issued press releases following the third and fourth quarters of 2001 which highlighted growth in both total revenue and product license revenue, growth which was inflated by the improper revenue recognition.  (Speechworks Press Releases July 18, 2001, Oct. 24, 2001, and January 30, 2002, Docket # 36, exs. 25-27.)  Intervoice was also Speechworks' largest customer.  (Def.'s Resps. to Pl.'s Statement of Facts ¶ 14.)  The

---

[9]Defendant's argument that Forman only knew about $1 million in pre-paid revenue, and thus the relevant revenue overstatement in the 2001 10-k was only 2.3%, turns on the question of fact as to what Forman knew about the transaction and the legal question, not briefed by the parties, whether Forman's alleged mistaken understanding of the size of the overstatement is relevant to materiality.

impact of the misstatements on the revenue numbers, particularly in relation to revenue

growth, is not so small as to be immaterial as a matter of law, see Ganino v. Citizens

Utils. Co., 228 F.3d 154, 162 (2nd Cir. 2000) (holding that misstatement amounting to

1.7% of revenue was not immaterial as a matter of law, and it is error to rely on a single

percentage benchmark to determine materiality), and the press releases along with the

status of Intervoice as the largest customer are evidence of the materiality of the

revenue to investors.  The determination of materiality is, therefore, a question for the

trier of fact.

### 4.    Scienter

Violations of Rule 10b-5 and § 17(a)(1) require the additional element of

scienter.  Aaron v. SEC, 446 U.S. 680, 691, 697 (1980).  Scienter is the requisite

mental state, encompassing both intent to defraud and a high degree of recklessness.

Greebel v. FTP Software, Inc., 194 F.3d 185, 198-99 (1st Cir. 1999) (holding that the

recklessness standard is closer to a lesser form of intent than a greater degree of

negligence).  The necessary recklessness is:

> a highly unreasonable omission, involving not merely simple, or even
> excusable negligence, but an extreme departure from the standards of
> ordinary care, and which presents a danger of misleading buyers or
> sellers that is either known to the defendant or is so obvious the actor
> must have been aware of it.

SEC v. Fife, 311 F.3d 1, 9 (1st Cir. 2002) (internal quotation marks omitted).  While it is

unusual to grant summary judgment on scienter, it is appropriate where the nonmoving

party "rests upon conclusory allegations, improbable inferences, and unsupported

speculation."  SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2009).

There is, albeit by a narrow margin, sufficient evidence of scienter to survive summary judgment.  Forman stated in testimony and his Wells submission that the pre-paid transaction was an "exception" to the published revenue recognition policy. (Forman Investigative Testimony 73, 109; Forman Dep. 116; Wells Submission 4-5, 19.)  He knew that this exception was not disclosed to investors.  (Forman Investigative Testimony 73.)  While this evidence is not without ambiguities, a jury could conclude it constitutes direct evidence that Forman knew the pre-paid revenue recognition, as disclosed, was misleading.

Forman has further testified that the pre-paid transaction was an exception to the normal practice of dealings with Intervoice, and without precedent at Speechworks. (Forman Investigative Testimony 82, 89-90, 93-94.)  Forman argues that he, as well as Haberman and Westelman, believed that the OEM agreement and royalty reports constituted the written evidence of the transaction.  There is, however, uncontradicted testimony that Forman had not read the OEM agreement and was unfamiliar with the contents of the royalty reports (see, e.g., Forman Investigative Testimony 89-90), and he expressed concern to Haberman about a lack of documentation (Haberman Investigative Testimony 454-55).  Forman admitted he had no way of knowing whether the OEM agreement or royalty reports would "cover" the transaction.  (Forman Investigative Testimony 92, 94-95.)   A jury could conclude that Forman acted with recklessness, given the unique nature of this transaction, when he failed to investigate whether the transaction was evidenced in those documents.  (See Pl.'s Expert Report 10.)  Such a conclusion is bolstered by evidence that Westelman pressured Forman to

16

recognize the revenue.  (Forman Investigative Testimony 101-02, 107.)

### 5.    Section 17

Forman makes two brief arguments for summary judgment specific to § 17, one succeeds and the other fails.  First, he argues that the misstatements were not "in the offer or sale of any securities," a threshold requirement for § 17 liability.  15 U.S.C. § 77q.  Courts draw no distinction between "in the offer or sale" and the "in connection with the purchase or sale" language of Rule 10b-5.[10]  See, e.g., Tambone, 417 F. Supp. 2d at 131; SEC v. Solucorp Indus., 274 F. Supp. 2d 379, 418-19 (S.D.N.Y. 2003).  The misstatements here, publicly disseminated in SEC filings, press releases, and earnings report conference calls upon which an investor would presumably rely, easily satisfy the 10b-5 standard. See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) (holding "it is enough that the fraud alleged coincide with a securities transaction - whether by the plaintiff or by someone else") (internal quotation marks omitted); SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); In re Ames Dept. Stores, Inc., 991 F.2d 953, 963 (2d Cir. 1993).

Second, he argues that there is no evidence he "obtain[ed] money or property" by means of the alleged misstatements, an element of liability under § 17(a)(2).  In response, the SEC points to evidence that all employees received a bonus of 3% of salary and executives received a bonus tied to Speechworks' financial performance. (Representation Letter to PwC March 20, 2002 at ¶ 25, Docket # 36 ex. 33; Pl.'s

---

[10]The outer boundary of the § 17(a) language has not been defined, but Forman identifies no case applying a more limited construction than that used with Rule 10b-5. See U.S. v. Naftalin, 441 U.S. 768, 773 n.4 (1979).

excerpts from Westelman's Investigative Testimony 316.)  There is, however, no evidence that the employee bonus was tied to company performance or that Forman was an executive within the meaning of the bonus plan.  (See Def.'s excerpts from Speechworks 2001 10-K at 13, Docket # 42 ex. 1.)  The SEC also contends that Forman benefitted when he sold stock in 2002, or alternatively he is liable for the benefit to Speechworks when the company sold (unidentified) securities, but the SEC has produced no evidence that the improper revenue recognition caused an increase in share price on the dates Forman or Speechworks sold securities.  The motion for summary judgment as to the § 17(a)(2) portion of Count 2 is allowed.

**B.      Rule 13 (Counts 3 and 9)**

Forman argues that he cannot be liable for circumventing internal controls and falsifying record in violation of Rule 13b2-1, or making false representations to an accountant in violation of Rule 13b2-2, because, respectively, it was Haberman, not Forman, who entered revenue figures into Speechworks' bookkeeping software and Forman had no knowledge of the prepaid transaction when he made any false or misleading representations to the auditors.

First, Forman cites no authority for the proposition that Rule 13b2-1 liability is limited to the person who mechanically enters revenue figures into the corporate records.  Second, it is undisputed that Forman spoke daily with auditors during annual audits and quarterly reviews (Def.'s Resp. to Pl.'s Statement of Facts ¶ 98) and that he knew the auditors were interested in unusual transactions (Id. at ¶ 99).  He signed representation letters to the auditors which included various assurances that there

were no oral arrangements or side letters which would impact revenue recognition and that revenue was recorded in a way consistent with GAAP and past financial statements.  (<u>See, e.g.</u>, Representation Letter to PwC March 20, 2002.)  A jury could conclude that Forman knew the prepaid transaction revenue was improperly recorded, and that his statements to the auditors were therefore knowingly false or misleading, in violation of Rule 13b2-2.  Forman's motion for summary judgment as to the Rule 13 counts, numbers 3 and 9, is denied.

### C.      Aiding and Abetting (Counts 4, 6, 7, 8, and 10)

Forman argues that aiding and abetting liability requires actual knowledge, § 78t(e), and he lacked knowledge of the prepaid transaction.  The SEC contends that the applicable mental state is recklessness, not actual knowledge, because Forman had a duty to disclose.  Regardless, Forman's knowledge and recklessness are disputed issues of fact.

### III.    Conclusion

The SEC's motion for partial summary judgment (Docket # 35) is DENIED. Defendant's motion for summary judgment (Docket # 38) is ALLOWED as to the § 17(a)(2) portion of Count 2 and DENIED as to all other counts.  Defendant's motion in limine (Docket # 43) is DENIED.


| | |
|---|---|
| _____June 9, 2010_____ | _____/s/Rya W. Zobel_____ |
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |